IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

BARBARA JEAN WILKINS TRUST,        )
                                   )
            Plaintiff,             )    TC-MD 130060D
                                   )
      v.                           )
                                   )
WASHINGTON COUNTY ASSESSOR,        )
                                   )
            Defendant.             )    **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 11, 2013. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiff appeals the 2012-13 real market value of property identified as Account R1294094 (subject property). A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on October 2, 2013. Jay M. Weil (Weil), Trustee, appeared and testified on behalf of Plaintiff. Donald R. Palmer (Palmer), MAI and Oregon certified general appraiser, testified on behalf of Plaintiff. Chris Werner, Business Property Supervisor, appeared on behalf of Defendant. Melissa Ahern (Ahern), Business Property Appraiser, Washington County Assessment and Taxation, testified on behalf of Defendant.

Plaintiff's Exhibits A through G and Defendant's Exhibit A were admitted without objection.

## I. STATEMENT OF FACTS

The parties agreed that the subject property is a two-building commercial mixed used property located on 1.23 acres that "includes an office building and a shop building on

commercially zoned land within the city of Hillsboro." (Ptf's Ex A at 1, 6; Def's Ex A at 4.)

The parties stipulated that the:

> "subject improvements consist of two buildings totaling 13,600 sf. The first building is a one level, 4,800 square foot (35% of the total sf), wood-frame, fair quality office building with two tenant spaces. This building had 2,100 square feet (44%) vacant as of the valuation date, but is now occupied.
>
> "The second building is a shop building, 8,243 square feet with 557 square feet of mezzanine space (totaling 8,800 square feet, 65% of the total sf), average quality, concrete block construction with six tenant spaces. This building was 100% occupied as of the valuation date."

(Def's Ex A at 12.) The parties agreed that the subject property's highest and best use as improved is its existing use. (Ptf's Ex A at 24; Def's Ex 13-14.) The parties stipulated that as of the assessment date the subject property's real market value should be adjusted for the cost ($64,000) to replace the roof. (Ptf's Ex A at 48; Def's Ex A at 21, 32 and 41.) The parties discussed fire damage that occurred to the subject property after the assessment date and agreed that an adjustment was not appropriate.

Weil testified that Plaintiff purchased the property in 1991 in a "non-arm's length section 1031 transaction." He testified that the "mixed use" of the property makes it "hard for a judge to get a good idea of value." Weil testified that the subject property is "well managed – I am the manager." Palmer testified that the subject property was "built in 1983, remodeled in 1991" and is located in a "static, not a lot of new construction" neighborhood." He testified that the "irregular" shaped lot results in a shared access to the subject property with the neighboring car wash.

Palmer's testimony reviewed each of the three valuation approaches. (Ptf's Ex A.) Palmer testified that because the subject property was built in 1983, the cost approach is not applicable; that approach is generally used for "a newer property that is five to ten years old" and is "not a good third check on [the subject property's] value." Palmer concluded that the sales

comparison approach should be used "as a check on the income approach" because it was difficult to find properties comparable to the subject property.

Palmer reviewed his income approach, which he described as a "modified gross income" because the "landlord pays all expenses (including water, sewer, landscaping, sweeping, insurance, garbage, management and maintenance) except electricity and heat." He testified that the "first step * * * is to estimate the subject's potential gross income," comparing "the subject with similar properties having similar locations and utility." (Ptf's Ex A at 27.) Palmer reviewed three properties that he identified were comparable to the subject property, stating that the "comparable leases range from $5.88/SF to $6.72/SF" and the "subject's average rent is $5.02/SF." (*Id*. at 31.) "Given the subject's below average condition the existing lease rate of $5.02/SF is concluded for the subject shop space." (*Id*.) Defendant challenged the comparability of Palmer's lease rentals given the location and size of the comparable properties in comparison to the subject property which is not located in an "industrial park." Ahern testified that Palmer's lease rentals do not support his concluded rental rate because $5.02 per square foot is "outside the range of his comps."

Palmer identified five "office lease comparables" that he adjusted "from full service rents to conform to the subject's expense structure." (*Id*. at 35.) He testified that the five comparable office leases ranged "from $8.52/SF to $13.50/SF, which support the subjects (*sic*) rents" of $11.40. (*Id*.) Ahern critiqued Palmer's comparable properties, noting that comparables 1, 2, and 5 were two story buildings whereas the subject property is one story, comparable 3 was a three story condominium, and comparable four, a "flex warehouse, 65 percent office and 35 percent production" was located in Vancouver, Washington. Ahern testified that Palmer's selection of the subject property's actual average rate of $11.40 per square foot, like the subject's shop

average rent of $5.02 per square foot, results in Palmer valuing the subject property as a "lease fee" rather than "fee simple."

Palmer testified that he relied on "the Norris, Beggs & Simpson Industrial market survey," showing that "the subject's area of the Southwest Sunset Submarket had a Q4-2012 vacancy rate of 4.56%" to support a "5.0%" vacancy and credit loss. (*Id*. at 35.) Palmer responded that he had no knowledge of the "Q4-2012 vacancy rate" and he relied on one source, Norris, Beggs & Simpson Industrial Market Survey. Palmer testified that using the "subject's actual 2011 and 2012 expenses," less property taxes and "reducing the management cost to 5% of the collected rents," the "adjusted expenses is $26,767." (*Id*. at 36.) Palmer testified that after deducting the expenses from the "estimated effective gross income of $94.734" he computed a "stabilized net operating income of **$67,967**, or $494 per square foot." (*Id*.) (Emphasis in original.)

Palmer testified that to determine a capitalization rate he selected "the most recent capitalization rates for industrial and office/retail properties on a local basis[.]" (*Id*. at 36.) He concluded that the:

> "capitalization * * * comparable rate indicate a relatively narrow range from 8.20% to 9.68%, with the high end represented by the Comparable 4 which is an older facility located in a slightly inferior location make it a high indicator. * * * Comparable 1 (9.00%) is reflective of higher risk market conditions, it is a multi-tenant facility leased to a single-tenant placing upward pressure on the capitalization rate. Comparable 1 is considered a good indicator when balanced against the subject's inferior condition. * * * Based on the comparables presented, and considering that capitalization rates decreased over the year prior to the valuation date, a capitalization rate of 9.0% will be used in this analysis."

(*Id*. at 37.) Defendant questioned Palmer about the six properties selected, noting that four of the six properties were "industrial flex-warehouse" properties, two properties were substantially larger than the subject property, one property was sold in 2009, two properties were sold after the assessment date, and one property was a "retail power center" and was not an arm's length

transaction. Palmer agreed that the subject property is "not suitable for retail." Palmer testified

that to the 9 percent capitalization rate he added 1.2 percent for "the property tax rate," resulting

in an overall capitalization rate of 10.2 percent. (*Id*.) Palmer testified that the "rounded" subject

property's real market value was $666,000. (*Id*.)

Palmer testified that he used the sales comparison approach "to check" the subject

property's "value" determined by the income approach. (*Id*. at 39.) In his appraisal report,

Palmer stated:

> "The subject [property's commercial shop] is valued as one marketable economic
> improved site in this appraisal. The most relevant unit of comparison is the price
> per square foot of building area, as it best reflects the analysis used by buyers and
> sellers in this market for industrial buildings with similar utility and zoning."
>
> "* * * * *
>
> "General or qualitative analysis reflecting market behavior is also used to
> determine which comparable sales are superior or inferior to the subject.
>
> "* * * * *
>
> "Some of the sales are after the valuation date, however due to the slow recovery
> sale prices have been flat over since January 1, 2012."

(*Id*. at 39.) Palmer testified that "all comparable sales considered were of superior quality to the

subject. Based on the previous analysis, the Comparable[s] 1 through 4 indicate a narrow range

of $44/SF to $46/SF." (*Id*. at 43.) Palmer testified that after "[c]onsidering the subject's

location, conditions and lack of exposure, the value falls in the range of $40/SF to $45/SF. The

indicated value is concluded at the lower end of the range at $40/SF," or $360,000. (*Id*.) Ahern

testified that the buyer of comparable 1 was "motivated" to acquire the property for a daycare

facility and "tore down" the existing structure; comparable 2 is located in North Plains, a

community of "1900 that is not a similar market" and the sale was not an "arm's length

transaction; comparable 3 was "sold to a long term tenant" and not "marketed in open market;"

and comparable 4 is a "condominium" with "no land value." Ahern testified that Palmer's indicated value at $40 is "outside the range of the comparables."

Palmer testified that to determine the subject property's "office" portion he selected "four improved office sales" that ranged "in price from $78.55 to $93.28." (*Id*. at 47.) In his appraisal report, Palmer wrote:

> "[T]he sales indicate a range of $78.55/SF to $93.28/SF; however, a price per square foot slightly below the comparable range is warranted considering the subject's overall quality, condition, location, and existing tenants mostly on month-to-month leases. Therefore, a unit value ranging of $75 per square foot will be concluded for this analysis" or $360,000."

(*Id*.) Ahern testified that comparable 1 was not "listed on the open market and was not an arm's length transaction because it was sold to a business associate to recoup due owed;" comparable 2 "is a two story 13,400 square foot building;" and comparable 3 was a "distress or foreclosure sale" of a two story building.

Palmer testified that his conclusion of value using the sales comparison approach was $720,000 or $52.33 per square foot. (*Id*.) He testified that the sales comparison approach "generally supports the value indicated by the Income Approach." (*Id*.)

Palmer testified that he confirmed the "sales" by contacting "brokers, sellers and buyers." When asked about specific sales, Palmer testified that he did not make those contacts if the "property was sold on the open market" or "actively marketed."

Palmer testified that he placed "primary weight on the income approach" concluding a value "of the fee simple interest * * * as of the retrospective date of January 1st, 2012" of $666,000 before deducting the cost ($64,000) to replace the roof, resulting in an indicated value of $602,000 as of the assessment date. (*Id*. at 48.)

Ahern reviewed her appraisal report, noting that she considered the three valuation approaches. (Def's Ex A.) After briefly describing the subject property and surrounding

neighborhood and reviewing photographs, Ahern testified that she determined a real market value using the cost approach. (Def's Ex A at 4-12, 15-21.) She testified that she determined a land value using the "Washington County Assessment and Taxation Department's real estate sales records," selecting "[f]our sales with all utilities." (*Id*. at 15.) Ahern testified that all four properties were located in Hillsboro with the sales occurring before and after the assessment date. The sale prices per square foot ranged from $16.42 per square foot to $24.89 per square foot, resulting in "a market rate per square foot of $18.60." (*Id*. at 16.) Ahern testified that the "total land value indicated the Sales Price/per unit method is: * * * **$996,550** (rounded)." (*Id*. at 18 (emphasis in original).) Plaintiff asked Ahern if she was aware that "two or two and one-half years ago the Trust purchased an adjoining parcel for $8 per square foot." Plaintiff noted that each of the four parcels were not "irregularly shaped like the subject property" and comparable 1 had "240 foot frontage."

Ahern testified that she computed an "improvement value," using "Marshall [& Swift] Valuation Service Guide." (*Id*. at 19.) She testified that the "depreciated cost" as of the assessment date was $652,510. (*Id*. at 20.) Ahern testified that the indicated value using the cost approach was $1,585,060 (rounded) after the cost to cure of $64,000 for the roof. (*Id*. at 21.) She testified that, in her opinion, the cost approach was a "check against overall value."

Ahern testified that in "the sales comparison approach" the subject property was "compared to properties that have sold around the time of the date of appraisal." (*Id*. at 22.) In her appraisal report, Ahern stated that a "[c]ommon unit[] of comparison," price per square foot, was developed and "[s]ales comparables for the office building and sales comparable for the shop building, which sold near the effective appraisal date of 1/01/2012" do not warrant or support "time adjustments" and none were made. (*Id*.) Ahern testified that she selected two

sales of "office/shop" buildings, ranging from $68.99 per square foot to $90.96 per square foot, concluding that the subject property was superior to both properties. (*Id*. at 23, 31.) Ahern testified that she selected seven "office building" sales, ranging from $190.83 per square foot to $289.36 per square foot. (*Id*. at 25-26.) She testified that comparable 1 was a one-story building less than one-half mile away from the subject property and was rented on a "triple net basis." When asked why only one of the office building sales was located in Hillsboro, Ahern responded that her criteria included: "time, use, quality, type, size and condition" and those sales were the "best available in CoStar and county records." Ahern testified that she selected four "shop buildings" sales, ranging from $77.77 per square foot to $111.29 per square foot. (*Id*. at 28.) Ahern briefly reviewed the Sales Comparison Grid presented in her appraisal report. (*Id*. at 30.)

Ahern testified that the two sales "that include an office and shop" were "considered" and "weighted equally," resulting in a "sales price per square foot" of $80 (rounded) or an indicated value of $1,024,000 after cost to cure. (*Id*. at 31.) She testified that she developed a weighted value price per square foot of $231 for the "comparable properties with offices only" and a weighted average of $90 per square foot for the "comparable properties with shops only." (*Id*. at 31-32.) Ahern testified that she gave "equal weight" the "two office/shop sales" and the "single office and single shop sales." (*Id*. at 32.) Ahern determined the subject property's indicated real market value was $1,430,300. (*Id*.)

Ahern testified that her first step in determining an indicated real market value using the income approach was to determine market rent, using "data * * * obtained from property owners via County's Rent Survey process, information provided by property managers and tenants." (*Id*. at 33.) She testified that the rent per square foot for five office buildings comparable to the subject property ranged from $12.36 to $15.50, concluding "$14.00 per square foot * * * for the

subjects (*sic*) 4,800 sf of office space. (*Id*. at 34-35, 39.) Ahern testified that the rent per square foot of four shop buildings comparable to the subject property ranged from $6.38 to $6.67, concluding "$6.50 per square foot" for the main floor and $3.25 per square foot for the mezzanine space. (*Id*. at 37, 39.)

Ahern testified that she relied on the "Washington County Appraiser surveys" to determine an applicable vacancy rate. (*Id*. at 39.) She concluded that one percent of the projected gross rental income for the shop is a reasonable vacancy rate and 20 percent of the projected gross rental income for the office is a reasonable vacancy rate. (*Id*.) Ahern testified that "[p]rofessional publications" including "Kidder Mathews, Integra Realty, Norris Beggs & Simpson" were also reviewed for supporting data. (*Id*.)

Ahern's appraisal report stated that:

"expenses for small office space are reimbursed by the tenant under the NNN [net, net, net or triple net] lease (typically excluding management and reserves for replacement). The shop market rent has been projected on a modified gross rental basis, which includes real estate taxes, water and sewer. After reviewing the expense ratios provided on the rent surveys and sales mentioned in the Sales Approach, **8% projected gross income for the office building** will be deducted for expenses and **14% of the projected gross income for the shop building** will be deducted for expenses."

(*Id*. at 40 (emphasis in original).) Ahern's total expenses were $11,976. (*Id*.) She testified that the expense ratios stated in the surveys were "verified by the owners."

Ahern testified that she determined a capitalization rate based on the "comps from office/shop, shop and office sales." In her appraisal report, Ahern stated that "[a]fter analyzing all sales and considering the operating history associated with the subject and the quality and condition of the subject, a rate of **7.50%** is used." (*Id*. (emphasis in original).) Ahern testified that she "weighted" the "office sales comparable 35 percent" and "the office/shop and shop sales comparables 65 percent" and "rounded" the combined total from 7.61 percent to 7.50 percent.

(*Id.*) Ahern testified that, even though she agrees with Plaintiff that the property tax rate should be 1.2 percent, she did not "add" that amount to her "capitalization rate" because "the market does not do it that way."

Ahern testified that using the direct capitalization method she determined that the subject property's "[v]alue indicated by [the] income approach" was $1,224,250 (rounded) after the cost to cure reduction. (*Id.* at 41.)

After considering each of the three valuation approaches, Ahern testified that the income approach "is generally considered the most accurate measure to determine the market value of income producing properties" like the subject property. (*Id.* at 42.) Ahern "assigned the greatest weight (60%)" to the income approach, gave "[s]econdary weight" (30 percent) to the sales comparison approach and "the least weight" (10 percent) to the cost approach. (*Id.*) Ahern testified that the subject property's indicated real market value as of the assessment date was $1,322,175 or "$97/sf." (*Id.* at 43.)

## II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2012. ORS 308.007; ORS 308.210.[1] In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). "Real market value * * * shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 305.205(2).

---

[1] The court's references to the Oregon Revised Statutes (ORS) and the Oregon Administrative rules (OAR) are to 2011.

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 *2 (Jul 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). This court has stated that "it is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.* (*Reed*), 310 Or 260, 265, 798 P2d 235 (1990).

There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a). All three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property. OAR 150-308.205-(A)(2)(a). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue (Pacific Power)*, 286 Or 529, 533, 596 P2d 912 (1979).

/ / /

/ / /

/ / /

A.    *Income approach*

Each of the parties' appraisers considered the income approach. Palmer gave the income approach primary consideration and Ahern "assigned the greatest weight (60%)" to the income approach. (Def's Ex A at 43.)

"Any property that generates income can be valued using the income capitalization approach." Appraisal Institute, *The Appraisal of Real Estate* 447 (13th ed 2008). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach." *Id*. at 445. Anticipation is defined as "the perception that value is created by the expectation of benefits to be derived in the future." *Id*. at 35.

The income approach determines the flow of income that a reasonable and knowledgeable buyer would anticipate if purchasing the subject property on the assessment date. *Pacific Power*, 286 Or at 542. The income approach should also consider the past earnings of the subject property and the rate of change of its income. *Id*. Both parties looked to the market to determine potential gross income. The parties selected different rent comparables. (Ptf's Ex A at 31; Def's Ex A at 39.) After reviewing market rents, Palmer relied on the subject property's actual "average rent" for the office and shop buildings. Ahern determined rents that were substantially in excess of the subject property's rent received during the last two years. She determined the office rents, relying on the "triple net" (expenses other than water and sewer assumed by the tenant) rather than "modified gross rental basis" (tenant responsible for electric and heating) used by the subject property. There is no evidence that the office rent determined by Ahern could be charged by the subject property, especially given the subject property's recent negotiation of rent for the subject property's 2,000 square feet of vacant office space. The

subject property has a history of month-to-month leases for the shop building. There is no evidence that the subject property's shop rent could reach the level projected by Ahern. There is no evidence the subject property can reach the office rent projected by Ahern. As of the assessment date, the subject property was not fully leased. As of the date of the trial the subject property was fully leased. The potential gross income must reflect income attributable to the subject property when fully leased. After considering the subject property's past earnings and recent leasing experience, the court concludes that the subject property's potential gross revenue less vacancy is $100,000 (rounded).

Ahern determined expense ratios for both the office and shop, citing reliance on "rent surveys and sales mentioned in the Sales Approach." (Def's Ex A at 40.) Even though the subject property rents on a "modified gross rental basis," Ahern concluded that in determining expenses for the subject property it was appropriate to use triple net for the shop. (*Id*.) There was no documentation or cited reference in Ahern's appraisal report to substantiate the expense ratios. Palmer determined the average of the 2011 and 2012 subject property's actual expenses reduced for property taxes and one-half the management fee previously expensed. Palmer concluded that a management cost of "5% of the collected rents" was reasonable, but provided no evidence to support his conclusion. (Ptf's Ex A at 36.) Ahern concluded that it was inappropriate to use the subject property's actual expenses because the property must be valued as "fee simple," not "leased fee." Ahern did not define either term (leased fee or fee simple). "Leased fee" references a leased fee interest which is defined as "[a]n ownership interest held by a landlord with the rights of use and occupancy conveyed by lease to others." Appraisal Institute, *The Dictionary of Real Estate Appraisal* 161 (4th ed 2002). "Fee simple" references fee simple estate which is defined as "[a]bsolute ownership unencumbered by any other interest

or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." *Id*. at 113. It is unclear to the court why Ahern concluded that Palmer valued a leased fee estate when Palmer's approach incorporated adjusted stabilized expenses[2] for a two year period. (Ptf's Ex A at 36.) This court has previously stated that "[t]o calculate the [net operating income] appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Allen v. Dept. of Rev.*, 17 OTR 248, 254 (2003). Plaintiff's appraiser looked at historical gross income and expenses for the subject property and adjusted for market or stabilization.

To determine the subject property's real market value, the direct capitalization analysis divides the forecast net operating income of the property for the tax year by the capitalization rate. Palmer determined an overall capitalization rate of 10.2 percent, a 9 percent capitalization rate plus a 1.2 percent property tax rate. (Def's Ex A at 37.) Palmer selected six properties that he concluded were similar to the subject property, with four of the six properties identified by Ahern and Palmer's sales data as "flex warehouse." (Ptf's Ex G.) The capitalization rates ranged from 8.00 percent to 9.68 percent. (Ptf's Ex A at 37.) Ahern developed a capitalization rate of 7.50 percent exclusive of a property tax rate, combining data from the sales of office buildings, one shop building and one office/shop building. (Def Ex A at 40.) Most of the properties Ahern selected generated rents per square foot in excess of the subject property. After carefully reviewing the evidence, the court concludes an overall capitalization rate of 9.2 percent including a property tax rate of 1.2 percent.

/ / /

---

[2] Stabilized expense is defined as "[a] projected expense that is subject to change, but has been adjusted to reflect an equivalent, stable annual expense." Appraisal Institute, *The Dictionary of Real Estate Appraisal* 273 (4th ed 2002).

Based on an adjusted net operating income of $75,000 and an overall capitalization rate of 9.2 percent, the subject property's real market value is $815,000 (rounded) before the agreed cost to cure adjustment in the amount of $64,000. (Ptf's Ex C.)

B.    *Sales comparison approach*

Each of the parties' appraisers considered the sales comparison approach. Palmer concluded that "[c]onsidering the age of the improvements and conditions, the Sale Approach is given secondary weight in this analysis and is presented as a check on the concluded value of the Income Approach." (Ptf's Ex A at 25.) Ahern agreed, stating:

> "The Sales Comparison Approach provides a secondary indication of the market value, but receives less weight in the final analysis than the income approach due to the broad range of values that its value/unit typically generates. Another reason for placing less weight on this valuation method is that investors in large commercial developments typically use the capitalization method when estimating the market value from the potential investment's rate of return."

(Def's Ex A at 42.)

> Palmer stated:

> "The price per square foot method was presented in the **Sales Comparison Approach**. The subject property is not considered typical of the market. It is a mixture of a commercial office building and commercial shop with the shop having essential (*sic*) no exposure."

(Ptf's Ex A at 48 (emphasis in original).) Palmer determined an indicated value of "$720,000 or $52.33/SF of Building area" before cost to cure ($64,000) was deducted. (*Id*. at 47.) Ahern equally weighted the "two office/shop sales" and the "single office and single shop sales" to determine an indicated value of $1,430,400 after the cost to cure deduction. (Def's Ex A at 31-32.)

The difference between the parties' real market value determination is substantial and unresolved. The sales of properties identified by the two appraisers as comparable to the subject property are substantially different, resulting in indicated real market values that are

approximately $700,000 and $1,400,000. The parties' appraisers acknowledged that, given the subject property's mixed use (commercial and office), irregular shaped parcel and age, it was a significant challenge to find comparable properties. The comparable sales approach does not support the subject property's indicated real market value using the income approach. The court concludes that the comparable sales approach should be given little consideration.

The subject property's real market value per the tax roll was as follows:

| Tax Year | Real Market Value |
|----------|-------------------|
| 2010-11 | $724,866 |
| 2011-12 | $820,440 |
| 2012-12 | $825,040 |
| 2013-14 | $936,000 |

(Def's Ex A at 45.) Defendant did not reconcile Ahern's 2012-13 indicated real market value and the tax roll values. The county's tax roll real market value for 2012-13 was $825,040. That real market value is substantially close to the court's real market value determination before adjusting for the cost to cure.

C.    *Cost approach*

Plaintiff's appraiser gave no consideration to the cost approach and Defendant's appraiser gave little consideration to the cost approach. Given the subject property's age and subsequent remodel, the court gives no consideration to the cost approach.

III.  CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the most consideration must be given to the income approach. The subject property's real market value as of the assessment date, January 1, 2012, is $751,000 after deducting the cost to cure in the amount of $64,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2012-13 real market value of the subject property identified as Account R1294094 is $751,000.

Dated this ____ day of December 2013.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on December 30, 2013. The Court filed and entered this document on December 30, 2013.*